# Third District Court of Appeal

## State of Florida

Opinion filed March 7, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-2374
Lower Tribunal No. 17-17305
_____

**Florida Department of Transportation, et al.,**
Appellants,

vs.

**Marc Sarnoff, etc., et al.,**
Appellees.

An Appeal from a non-final order from the Circuit Court for Miami-Dade County, Samantha Ruiz-Cohen, Judge.

Marc Peoples, Assistant General Counsel (Tallahassee), for appellants.

Solowsky & Allen, P.L., and Mason A. Pertnoy and Jay H. Solowsky, for appellee Marc Sarnoff.

Before LAGOA, SALTER and LINDSEY, JJ.

SALTER, J.

The Florida Department of Transportation ("FDOT") and Michael J. Dew

(in his official capacity as Secretary of FDOT)[1] appeal an order denying FDOT's

motion to dismiss a circuit court lawsuit for improper venue. The issue before us is whether Florida's common law "home venue privilege," enjoyed by State agencies including FDOT, is subject to a statutory exception[2] applicable to certain FDOT contracts. Based on the record before us and the analysis which follows, we conclude that the statutory exception does not apply. We reverse the order denying the motion to transfer venue to the Circuit Court for Leon County, and we remand with direction to grant FDOT's motion.

The 2013 Lawsuit and Dismissal

In 2013, Marc Sarnoff (then Chairman of the City of Miami Commission) and Tomas Regalado (then Mayor of the City) filed a complaint and an amended complaint against the FDOT requesting several types of equitable relief regarding "FDOT's commitment to build a 'signature' bridge as part of a planned renovation of the I-395 corridor (the 'I-395 Project')." The plaintiffs and complaint sought class representation as to those City residents affected by the I-395 Project. The gravamen of the amended complaint was an alleged "bait and switch" by FDOT whereby a "transformative Signature Bridge project to uplift and ameliorate a long-blighted stretch of interstate" was to be replaced with a "'plain-Jane' segmental box bridge."

---

[1] We refer to both appellants collectively as "FDOT."

[2] § 337.19(1), Fla. Stat. (2017).

In the 2013 case, a class was never certified, and the only response to the amended complaint by FDOT was a motion to abate for improper venue (seeking a transfer of the case to the Second Judicial Circuit in Leon County, Florida, based on Florida Rule of Civil Procedure 1.060(b) and the home venue privilege). Leon County is the site of FDOT's principal headquarters. FDOT's venue motion was never heard or decided in the 2013 case; instead, following discussions among counsel and the parties, Commissioner Sarnoff, Mayor Regalado, and FDOT filed a joint motion to dismiss the amended complaint, without prejudice, on the grounds that "The parties have engaged in discussions about the design and construction of a new I-395 'signature' bridge and the parties are committed to **continued discussions** regarding same." (Emphasis provided).

The joint motion sought the trial court's leave for the dismissal, based on the plaintiffs' plea for class representation in the amended complaint and plaintiffs' counsel's "implied fiduciary duties to the putative class." The joint motion also contained these provisions:

> 4. FDOT shall organize a committee ("Committee") consisting of five (5) individuals to be selected by mutual agreement of Alice N. Bravo, P.E., City of Miami Assistant City Manager Chief of Infrastructure and Gus Pego, P.E., FDOT District Secretary, District 6. The role of the Committee is to serve as an advisor to FDOT.
>
> 5. On or before December 31, 2013, the Committee shall:
>
> (a) Evaluate and recommend to FDOT, from among various bridge concepts proposed by FDOT for the Project, the one that

3

Record best fulfills the commitments made by FDOT as part of the Project Environmental Impact Statement ("EIS") and the of Decision ("ROD") issued by the Federal Highway Administration.

(b)     Provide input to FDOT on the selection criteria for teams interested in submitting proposals for the Project.

(c)     During the procurement of the Project, serve as an aesthetic advisory group to FDOT.

6.     The parties agree that the cost of the entire project shall not exceed Six Hundred Million Dollars and NO/100 ($600,000,000.00).

The trial court promptly entered an order granting the joint motion for dismissal of the 2013 lawsuit, without prejudice. The form of order submitted to, and signed by, the trial court recited that the court was "informed that the parties are in agreement as to the relief requested in the Motion." That order did not, however, approve or ratify the terms of the joint motion as a settlement agreement, nor did it retain jurisdiction to enforce the undertakings in paragraphs 4 to 6 of the joint motion to dismiss (quoted above) regarding the advisory "Committee" or the $600,000,000.00 not-to-exceed cost of the bridge project.

Three and one-half years transpired, during which the aesthetic advisory committee apparently contemplated in the joint motion was formed and met to consider possible design concepts and public input. In May 2017, FDOT announced its intention to award the I-395 project to a joint venture. The following month, Mr. Sarnoff (by then a former City Commissioner) filed a motion

4

to re-open the 2013 case, to drop former Mayor Regalado as a party plaintiff, and to obtain relief for FDOT's alleged breach of its purported 2013 settlement agreement evidenced by the joint motion and based on subsequent activities by the advisory committee.

On July 17, 2017, the trial court denied Mr. Sarnoff's motion to re-open the 2013 case, noting that it had not retained jurisdiction over the matter. Two days later, Mr. Sarnoff filed a new complaint and demand for jury trial, again seeking certification of a class of similarly-situated residents of the City of Miami. In the 2017 lawsuit, Mr. Sarnoff alleged that FDOT and the plaintiffs in the 2013 lawsuit had reached a "settlement agreement," that the trial court had approved that settlement agreement, and that FDOT had then breached it.

As it had in the 2013 lawsuit, FDOT filed a motion to dismiss the 2017 complaint for improper venue, again invoking Florida's home venue privilege. The trial court denied FDOT's motion, and this appeal followed.[3]

Analysis

Florida's home venue privilege is based on decisional rather than statutory law. It dates back to the Supreme Court of Florida's decision in Smith v. Williams, 35 So. 2d 844 (Fla. 1948). Fla. Dep't of Children & Families v. Sun-Sentinel, Inc., 865 So. 2d 1278, 1287 (Fla. 2004); see also Carlile v. Game & Fresh

---

[3] We have jurisdiction to review the order under Florida Rule of Appellate Procedure 9.130(a)(3)(A).

5

Water Fish Comm'n, 354 So. 2d 362, 363-64 (Fla. 1977) ("It has long been the established common law of Florida that venue in civil actions brought against the state or one of its agencies or subdivisions, absent waiver or exception, properly lies in the county where the state, agency, or subdivision, maintains its principal headquarters.").

The State and its agencies are entitled to this privilege unless: "(1) it is inapplicable, based upon an exception recognized by the Florida Supreme Court or by statute; or (2) it has been waived." Castle Beach Club Condo., Inc. v. Citizens Prop. Ins. Corp., 96 So. 3d 964, 966 (Fla. 3d DCA 2012) (citing Fla. Dep't of Children & Families, 865 So. 2d at 1287-89). The Supreme Court of Florida has recognized four exceptions to the home venue privilege: (1) where the Florida Legislature waives the privilege by statute; (2) the sword-wielder exception; (3) where a governmental defendant is sued as a joint tortfeasor; and (4) where a party petitions the court for an order to gain access to public records. Fla. Dep't of Children & Families, 865 So. 2d at 1287-89.  In this case, Mr. Sarnoff claims FDOT may not invoke the home venue privilege because of a statutory waiver.

Mr. Sarnoff's arguments are: (1) the 2013 joint motion to dismiss, the order on that motion, and an "I-395 Steering Committee Charter" collectively constituted a written settlement agreement; (2) communications between FDOT and others corroborate the existence of such an agreement; (3) FDOT partly performed under

6

the purported settlement agreement; and (4) section 337.19(1), Florida Statutes (2017), permits local lawsuits against FDOT for breach of contract when the claim arises from "breach of an express provision or an implied covenant of a written agreement or written directive issued by the department pursuant to the written agreement." These arguments fail. We address them as two basic inquiries. First, did the parties enter into an enforceable written settlement agreement in 2013 as part of the dismissal of the earlier lawsuit? Second, are the documents relied upon by Mr. Sarnoff public contracts subject to chapter 337, including that chapter's statutory waiver of FDOT's home venue privilege in section 337.19(1)?

"Settlement Agreement"

"Settlement agreements are to be interpreted by and are governed by the same principles of law interpreting and governing contracts." Gaines v. Nortrust Realty Mgmt., Inc., 422 So. 2d 1037, 1039 (Fla. 3d DCA 1982). A settlement agreement must be sufficiently specific as to be capable of implementation and will not be enforceable if "too vague or ambiguous in its meaning or effect." Id. The parties "must reach mutual agreement on every essential element of the proposed settlement." Id. at 1040.

The joint motion for dismissal of the 2013 lawsuit asked the trial court to approve the dismissal of the 2013 lawsuit (still in its nascent stages) without prejudice, not to approve a settlement agreement. The use of the term "without

7

prejudice" signifies that the lawsuit might be re-filed at a later time. The trial court was not asked to confirm or ratify any terms, nor did it retain jurisdiction in the order of dismissal to enforce any agreement.[4]

Paragraphs 4 through 6 of the joint motion are quoted verbatim earlier in this opinion. Paragraph 4 provides for the organization by FDOT of a committee of five non-party individuals to be selected by three other designated individuals (one of whom was a regional FDOT secretary) "to serve as an advisor to FDOT." An agreement to receive advice, it hardly needs to be said, is not an obligation to accept, or perform in accordance with, that advice.

Paragraph 5 of the joint motion required the five-person advisory committee: to evaluate and recommend to FDOT, by December 31, 2013, the bridge concept that best fulfills the commitments made by FDOT as part of its environmental impact statement and a record of decision by the Federal Highway Administration; to "provide input" to FDOT on selection criteria for teams submitting bridge proposals; and to "serve as an aesthetic advisory group to FDOT." If the committee made such an evaluation and recommendation, there is no imposition of an obligation on the part of FDOT to accept or follow it. In approving dismissal of the 2013 lawsuit, the trial court did not agree to take

_____

[4] As already noted, the trial court in the 2013 lawsuit denied Mr. Sarnoff's motion to re-open the case for further proceedings in 2017.

jurisdiction over the to-be-formed committee, much less to enforce the committee's role of providing advice.

Finally, the agreement by the parties that the cost of the project would not exceed $600,000,000.00 is not based on any budget or other document identifying "the project" in sufficient detail to be enforceable. Paragraph 3 of the joint motion made it clear that the parties were still engaged in discussions regarding "the design and construction of a new I-395 'signature' bridge," and the actual procurement process was not yet underway.

Turning to the other writings contended to be part of a "settlement agreement," only two warrant discussion. The first is an unsigned, undated "I-395 Steering Committee Charter." This five-paragraph, two-page document designates the five members of the I-395 Steering Committee and generally describes the Committee's mission as evaluating bridge concepts proposed by FDOT, emphasizing three project goals: maximizing aesthetic value; elevating the highway to the maximum extent possible to improve natural lighting to the areas beneath the highway; and reconnecting streets within the Overtown Community. The I-395 Steering Committee was to "help establish selection criteria for the teams pursuing a Design-Build-Finance (DBF) project to implement the I-395 Project." During the procurement and bid process, the Committee was to serve as

the "Aesthetic Advisory Group" to report (with another group, the Technical Advisory Group) to the Selection Committee.

The second document warranting discussion is a letter from the District Secretary for FDOT for the region including Miami-Dade County, Jim Wolfe, P.E. In May 2017, Mr. Wolfe wrote the Mayor and a Commissioner of Miami-Dade County a letter regarding the status of the "I-395 Reconstruction Project." Excerpts from the letter are relied upon by Mr. Sarnoff as corroboration that an enforceable settlement agreement emanated from the 2013 lawsuit and dismissal:

> The Department has **committed** to providing the citizens of Miami a project that will be transformative to the community.
>
> * * *
>
> **As previously agreed** between the Department and the City of Miami, the process of selecting a bridge concept and the vendor included the input of an aesthetic advisory committee selected by joint agreement of a representative of the City and a representative of the Department, to provide an additional mechanism for local input into the project process.[5]
>
> * * *
>
> In addition to the extensive public outreach conducted by the Department, the Department actually afforded the advisory committee greater participation in the procurement process than was strictly required **under the terms of its agreement with the City**. The Department's procurement process fully complied with both **the letter and the spirit of its agreement with the City** and with applicable State law.

(Emphasis provided).

---

[5] Mr. Wolfe's letter noted that the aesthetic advisory committee held public meetings on nine dates from February 2014 through September 2015.

10

FDOT's agreement to appoint a committee and receive advice regarding aesthetics is not (without more) an enforceable settlement agreement, and in approving dismissal of the 2013 lawsuit, the trial court never suggested that the terms in the joint motion were a settlement agreement. Collectively, the documents relied upon by Mr. Sarnoff demonstrate that FDOT agreed to receive input, not from Mr. Sarnoff, but from non-parties residing and working in the County in which the project-in-process was to be located. They do not establish a meeting of the minds of the parties with specific, enforceable terms, as required under Gaines and the cases cited in that opinion.[6]

Statutory Waiver; Section 337.19

Section 337.19, captioned "Suits by and against department; limitation of actions; forum," unquestionably establishes an exception to Florida's home venue privilege. Contract claims by or against FDOT and based on a "written agreement or written directive issued by the department" (subparagraph (1)) may be filed and prosecuted "in the county or counties where the cause of action accrued, or in the county of the department's district headquarters responsible for the work, or in Leon County" (subparagraph (3)). Mr. Sarnoff contends that the purported settlement agreement could be filed in Miami-Dade County based on the location

---

[6] Gaines is still good law relating to settlement agreements and the enforceability of such agreements, and is still regularly cited in District Court and federal opinions throughout Florida. See, e.g., Miller v. U.S. Sec. Assocs., Inc., 2017 WL 3337066, at *2 (S.D. Fla. Aug. 4, 2017).

of the district headquarters and the County where the claim for breach of the agreement arose.

If we agreed with Mr. Sarnoff's contention that the joint motion to dismiss and other documents constituted a written, enforceable settlement agreement (which we do not), we would nonetheless disagree that the agreement could be enforced in Miami-Dade County. The statutory waiver of FDOT's home venue privilege must be considered in light of the kinds of agreements and directives that are subject to the waiver.

Chapter 337 addresses the administration of public contracts for State transportation projects. The provisions of the chapter include requirements for competitive bidding, the purchase and sale of property, the acquisition of necessary aggregate materials for construction, the development and retention of vendors and professional services providers, and other aspects of building and maintaining transportation infrastructure.

Importantly, section 337.19(1) addresses actions by and against FDOT and a "contractor:" "In any such suit, the department and the contractor shall have all of the same rights and obligations as a private person under a like contract except that no liability may be based on an oral modification of either the written contract or written directive." In context, it is apparent that the statutory waiver applies to actions by and against FDOT under signed, authorized contracts with a

"contractor" for construction of a transportation-related project (or the delivery of goods or services related to that construction).

On the record before us, Mr. Sarnoff was not and is not such a "contractor" with respect to the I-395 highway project. The only "settlements" addressed in Chapter 337 are addressed in section 337.221, "Claims settlement process." Those settlements pertain to "contractual claims between the department and providers of goods and services" and the "recovery of additional costs resulting from substandard goods and services provided to the department." A transportation contractor may assert a claim against FDOT, or FDOT may assert a claim against such a contractor, arising under an authorized public construction contract. A purported settlement agreement whereby FDOT agrees to consider input from community leaders and infrastructure planning professionals (on an unpaid basis) as procurement and authorization of actual design and construction contracts **are underway** does not resemble a complete, written contract procured and signed under the strictures of the public contracts statutes applicable to FDOT.

The limited waiver available to contractors under section 337.19 is inapplicable to the joint motion to dismiss the 2013 lawsuit and other documents contended by Mr. Sarnoff to comprise a contract with FDOT.

Conclusion

There is no question that Mr. Sarnoff and his counsel were civic-minded[7] and sought to impress upon FDOT's district office the importance of local advice and input relating to an important local transportation project. The trial court recognized that and duly noted, in the hearing on FDOT's motion, the language of section 337.19 allowing a contract claim against FDOT to be "brought in the county where the cause of action accrued."

We are constrained, however, to carefully review the details of the purported "contract" or "settlement agreement," as well as the limitations on the statutory waiver in section 337.19. After doing so, we reverse the order denying FDOT's motion to dismiss for improper venue and remand the case to the trial court to grant the motion.

Reversed and remanded.

---

[7] In the joint motion to dismiss the 2013 lawsuit, for example, counsel for Mr. Sarnoff represented that his firm was representing the plaintiffs without charge.